IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JOHN BURCH, On Behalf Of,
ELIZABETH BELL WOODY                                                    PLAINTIFF

v.                          Civil No. 05-4063

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                          DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, John Burch, brings this action on behalf of his minor granddaughter, Elizabeth Bell Woody, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for supplemental security income benefits under Title XVI of the Social Security Act. Both parties have submitted appeal briefs (Doc. 9 and Doc. 10) and the court has the transcript of the social security proceedings.

**PROCEDURAL BACKGROUND**

On August 29, 2000, Burch, on behalf of Elizabeth Bell Woody (hereinafter Elizabeth), protectively filed a Title XVI application for supplemental security income (SSI) (Tr. 15, 77). It was alleged Elizabeth became disabled on July 4, 1994 (her date of birth), because of attention deficit disorder (ADD), predominately inattentive type, sexual abuse, depressive disorder, not otherwise specified (NOS), parent-child relational problems, and cognitive disorder, NOS. (Tr. 16, 77).

The claim was denied both initially and on reconsideration. (Tr. 37 & 36). Burch then requested a hearing. (Tr. 57). The hearing was held before an administrative law judge (ALJ)

on December 5, 2001. (Tr. 41). The ALJ issued an unfavorable decision on May 14, 2002. (Tr. 38-49). The claimant requested review and the Appeals Council remanded the claim on November 22, 2002, due to a lost hearing tape. (Tr. 32-34).

A subsequent application was protectively filed on June 27, 2003. (Tr. 15, 299-303). The application was denied initially and on reconsideration. (Tr. 15, 286-287, 288-289).

After a hearing was requested, the two applications were consolidated. (Tr. 15, 297). The hearing was held before an ALJ on March 16, 2005. (Tr. 602-646). Elizabeth appeared and testified (Tr. 607-621) as did her grandfather, Burch (Tr. 621-646). Elizabeth was represented by counsel. (Tr. 604).

On June 21, 2005, the ALJ issued an unfavorable decision finding Elizabeth was not disabled. (Tr. 12-22). The ALJ first found no evidence that Elizabeth, then 10 years old, had worked. (Tr. 16). The ALJ then found that Elizabeth had established the existence of medically documented impairments that cause more than minimal functional limitations. (Tr. 16). The ALJ found Elizabeth had the following severe impairments: attention deficit disorder, predominately inattentive type; sexual abuse of a child victim; depressive disorder, NOS; parent-child relational problems; and cognitive disorder, NOS. (Tr. 16). However, the ALJ found the severe impairments did not meet or medically equal any impairment described by the Listing of Impairments. (Tr. 16).

The ALJ then turned to the question of whether Elizabeth's impairments were functionally equal to the severity level of the impairments contained in the Listing of Impairments. (Tr. 16). In analyzing functional equivalence, the ALJ considered Elizabeth's age in conjunction with the following domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About

and Manipulating Objects; (5) Caring for Ones Self; and (6) Health and Physical Well-being. (Tr. 17-18). The ALJ concluded the evidence demonstrated that Elizabeth had a marked limitation in the third domain of interacting and relating to others and a less than marked limitation in the second domain of attending and completing tasks and in the sixth domain of health and physical well-being. (Tr. 20). The ALJ therefore concluded Elizabeth did not have an impairment, or combination of impairments, that were functionally equal to those contained in the Listing of Impairments. (Tr. 21).

On July 13, 2005, the claimant requested a review on the record. (Tr. 10). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied the claimant's request for review. (Tr. 7-9).

**HEARING AND EVIDENCE CONTAINED IN THE RECORD**

At the time of the hearing before the ALJ, Elizabeth was ten years old (date of birth July 4, 1994). (Tr. 607). She was in the fifth grade. (Tr. 608). Her favorite class was science. She also has math, English, and writing. (Tr. 608-609). She got an A in science, an F in math, a C in English, and a B in writing. (Tr. 608-609).

Elizabeth has one brother and two sisters. (Tr. 610). Their ages are 8, 13, and 14. (Tr. 610). Elizabeth testified she hits her brother and fights with her sisters. (Tr. 610). Elizabeth testified her sisters hit on her and she gets made fun of at school by the boys. (Tr. 612-613).

Elizabeth shares a room with three other girls–her two sisters and her cousin who is 10. (Tr. 611). There are six more cousins that live there. (Tr. 612). They all live with Elizabeth's grandfather. (Tr. 611). All together there are ten children living with the grandparents. (Tr. 612).

Elizabeth picks out her own clothes each day, gets cleaned up, brushes her teeth, and gets herself dressed. (Tr. 613). She can tie shoes. (Tr. 618).

She can follow directions when her grandfather asks her to do things but doesn't always do it. (Tr. 614). Elizabeth doesn't always remember to do her homework and sometimes gets her cousin to help her with it. (Tr. 614). Because she doesn't have a binder, Elizabeth stated her homework sometimes doesn't get turned in. (Tr. 615).

Elizabeth has chores at home. (Tr. 615). She is supposed to feed and water the animals. (Tr. 615). They have chickens, ducks, roosters, dogs, and cats. (Tr. 615). Her grandmother helps her with the chores. (Tr. 615). Elizabeth also helps clean the room she shares with three other girls. (Tr. 618).

Elizabeth takes medication every day. (Tr. 619). Her grandmother helps make sure Elizabeth takes it. (Tr. 619). The medication is helping Elizabeth feel better. (Tr. 619). It helps her fall asleep at night. (Tr. 620).

John Burch testified he is Elizabeth's grandfather. (Tr. 622). He indicated that they have seven kids living with them in the house because and three additional children that they baby-sit for. (Tr. 622). The three they baby-sit are his son's children. (Tr. 622-623).

Neither Burch nor his wife work. (Tr. 623). Three of the kids are "real bad." (Tr. 623). One has scoliosis, one has a hemorrhage on his brain, and one has schizophrenia. (Tr. 623). These three have been drawing SSI benefits every since they were born. (Tr. 624).

Elizabeth was seventeen months old when Burch first got custody of her. (Tr. 626). Burch understands from the counselors that Elizabeth has to be watched closely or "she might turn into what" her sister has–schizophrenia. (Tr. 624). In 1997, Burch states he had to take

AO72A
(Rev. 8/82)

custody of Elizabeth and her sisters because they were sexually abused by their father. (Tr. 624-625). There was also evidence of neglect and physical abuse. (Tr. 626-627).

Burch testified Elizabeth will occasionally make a good grade on her report card such as an A or a B but then the rest of the time she will have F's. (Tr. 628). Burch indicated Elizabeth was in regular classes about half of the time and special education classes the other half of the time. (Tr. 638).

Burch also testified Elizabeth had been faking physical ailments such as stating she had kidney infections or was bleeding in her panties. (Tr. 629). Burch indicated Janelle Barnes, the therapist, caught her doing this. (Tr. 629-630).

Burch testified Elizabeth can tell time but only on digital clocks. (Tr. 632). He also indicated she could dress herself if her grandmother picked out Elizabeth's clothes first. (Tr. 632).

Burch testified they had some difficulties with Elizabeth. (Tr. 632). For instance, the other morning she didn't want to go to school and hid her shoes. (Tr. 632). When they asked her to go get them, she stated she didn't know where they were. (Tr. 632). They then told her to put the other pair on because she was going to school. (Tr. 632). Elizabeth didn't want to and ran down the highway. (Tr. 632). Burch testified they had to call the police. (Tr. 632).

Burch testified Elizabeth had no physical problems that concerned him at that point. (Tr. 635). With respect to her behavioral problems, Burch testified Elizabeth had improved "about half" since he filed the application for SSI. (Tr. 637).

The pertinent medical and vocational evidence in this case reflects the following. Elizabeth was seen by Dr. Roger House on a number of occasions between April of 1998 and May of 2000. (Tr. 187-189, 162-175). Elizabeth had problems with being hyperactive,

AO72A
(Rev. 8/82)

aggressive, sexual acting out, nightmares, inability to sleep, poor appetite and poor concentration. (Tr. 187, 174). Dr. House diagnosed Elizabeth with ADHD and impulse control disorder, NOS. (Tr. 189, 164). During therapy Elizabeth would appear to improve, for instance, she was reported not to be acting out sexually on June 8, 1999 (Tr. 163), but then in April of 2000 it was again noted that she was acting out sexually with her sister and cousins (Tr. 162).

On May 20, 1999, Dr. House completed an individualized functional assessment and case summary on Elizabeth. (Tr. 166-169). He listed his Axis I diagnoses as: Attention Deficit Hyperactivity Disorder (ADHD) and impulse control disorder, NOS. (Tr. 166). He noted she had a less than moderate limitation in cognitive development and seemed to be doing well in preschool according to a progress report from the preschool. (Tr. 166). He noted she had a moderate limitation in communicative development and a less than moderate limitation in motor development. (Tr. 166). He indicated she had a marked limitation in social development and indicated she had a history of sexual abuse allegations and a marked limitation in personal/behavioral development/function. (Tr. 167). Finally, he noted she had a moderate limitation in concentration, persistence, and pace. (Tr. 167). He noted her grandmother reported Elizabeth was oppositional and defiant and did not sleep well. (Tr. 169). Note was also made that Elizabeth got violent and destructive, fought with her sisters, and tried to get in bed with her sisters and take their clothes off. (Tr. 169). Elizabeth was on Imipramine and Risperdal. (Tr. 170).

On August 7, 2000, Elizabeth was evaluated at the Southwest Arkansas Counseling and Mental Health Center, Inc. (Tr. 140-151, 190-201). Elizabeth was six years old at the time and referred by her adoptive grandparents for stabbing animals, acting out, and playing with feces.

(Tr. 150). Note was made of the fact that Elizabeth was a victim of past neglect and physical abuse. (Tr. 150). The Department of Children and Family Services was contacted and it was determined that the case involving the Father's alleged molestation of Elizabeth had been closed for three years. (Tr. 150).

On September 26, 2000, Dr. Segundo Ibarra saw Elizabeth. (Tr. 157). Elizabeth's grandmother reported Elizabeth having a lot of problems with hyperactivity and also reported that Elizabeth had stripped a doll until it was nude and then took all her own clothes off. (Tr. 157). Elizabeth talked about her daddy seeing nasty movies, bad dreams about a man dying, her dad and uncle getting in a fight, and her daddy touching her "down there." (Tr. 157). It was reported that when Elizabeth received a visit from her father she became frightened and did not want to eat. (Tr. 157).

Elizabeth was seen by Dr. Ibarra on September 5, 2000. (Tr. 158, 211). Dr. Ibarra noted Elizabeth had a long history of neglect and abuse. (Tr. 158). Elizabeth was not eating well and was wetting the bed. (Tr. 158).

On October 20, 2000, Elizabeth was seen by Dr. Ibarra. (Tr. 155, 209). Dr. Ibarra diagnosed her with Post-Traumatic Stress Disorder (PTSD) and ADHD, NOS, most likely due to sexual abuse. (Tr. 157). It was noted that the Imipramine had improved Elizabeth's hyperactivity. (Tr. 155). Elizabeth was sleeping well and not having any side effects from the medication. (Tr. 155).

However, when she was observed, Elizabeth showed symptoms of hyperactivity, impulsivity, and inattention. (Tr. 155). It was decided to increase the Imipramine to 20 mg. at night and add Dexedrine 5 mg. in the morning. (Tr. 155).

In a progress note dated January 16, 2001, Dr. Ibarra noted that Elizabeth continued to have problems like pulling the head off of her dolls and sneaking Coca-Cola in her room at night and sometimes candy. (Tr. 153, 214). She was doing well in school with the exception of reading. (Tr. 153). Note was made that there had been some problems since Elizabeth had not been taking her medication due problems in the home that had also impeded psychotherapy visits. (Tr. 153).

On January 11, 2001, Elizabeth, at the request of the Administration, underwent an intellectual assessment and evaluation of adaptive functioning. (Tr. 159-161). The Weschsler Intelligence Scale for Children–Third Edition was administered. (Tr. 159). Elizabeth's verbal IQ was 85, her performance IQ 83, and her full scale IQ 83. (Tr. 160). She was functioning within the low average range of intelligence. (Tr. 160).

Elizabeth's grandfather reported Elizabeth had problems getting along with other children and displayed oppositional behavior. (Tr. 159). Elizabeth was on Ritalin for problems related to ADHD. (Tr. 159).

Elizabeth underwent play therapy beginning in February of 2001 and lasting until December of 2001. (Tr. 220-230, 250-282). On April 14, 2001, Burch completed a disabled child supplemental questionnaire. (Tr. 122-123). When asked to describe what Elizabeth did on an average day, Burch sad she had "mad fits," destroyed things, and threw things. (Tr. 122). Burch indicated Elizabeth would not dress herself, wouldn't eat, and wouldn't pay attention to what was good for her. (Tr. 122). Burch stated Elizabeth was born this way. (Tr. 122).

AO72A
(Rev. 8/82)

Burch stated Elizabeth did not get along with other kids or anyone. (Tr. 122). Burch indicated Elizabeth could not take care of her own personal needs and did not help with household chores. (Tr. 123). He indicated she needed total supervision. (Tr. 123).

On June 29, 2001, Dr. Ibarra completed a "psychiatric documentation form." (Tr. 243-249). Dr. Ibarra noted Elizabeth had an anxiety-related disorder with generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance scanning; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; and a history of sexual abuse by her father resulting in her being sexually hyper-aroused. (Tr. 246-247). With respect to functional limitations, he noted Elizabeth had marked limitations in the restriction of activities of daily living and difficulties in maintaining social functioning and would often have deficiencies of concentration, persistence and pace. (Tr. 249).

Elizabeth participated in both individual and group therapy from March of 2002 through October 31, 2002. (Tr. 391-414). Dr. Ibarra last saw Elizabeth on June 25, 2002. (Tr. 411). On that date, Dr. Ibarra noted that Elizabeth had ADHD, as well as most likely PTSD, due to physical and sexual abuse, and continued to experience some symptoms of depression. (Tr. 411). In terms of school, note was made that Elizabeth was not having any behavioral problems. (Tr. 411). Dr. Ibarra discontinued the stimulants and Imipramine and started a low dose of Zoloft. (Tr. 411). Elizabeth was to return to see Dr. Marianne Seidel in eight weeks or so. (Tr. 411).

On July 19, 2002, the Zoloft was discontinued by Dr. Seidel and a prescription for Adderall and Imipramine given. (Tr. 404). The Adderall was not to be given until Elizabeth started school. (Tr. 404).

AO72A
(Rev. 8/82)

On November 5, 2002, the Arkansas Department of Health performed a hearing screen test on Elizabeth. (Tr. 330). The test revealed she did not hear any of the test frequencies in her left ear and did not hear the 4000 hz frequency in her right ear. (Tr. 330).

On December 3, 2002, Dr. David L. Whitt noted that an audiogram performed on Elizabeth showed large conductive hearing losses with flat tympanograms. (Tr. 348). On December 9, 2002, Dr. Whitt placed tubes in Elizabeth's ears due to recurrent acute otitis media. (Tr. 346). On December 26, 2002, Dr. Whitt stated Elizabeth's audiogram was normal. (Tr. 343).

Elizabeth's primary care physician Dr. George K. Covert referred her to the Southwest Arkansas Counseling and Mental Health Center, Inc, in January of 2003 to be seen by a therapist and by a psychiatrist due to depression and behavioral problems. (Tr. 362). Elizabeth was seen by Janelle Barnes, a therapist and Marianne Seidel, a psychiatrist. (Tr. 375). In July of 2003, when the referral expired, another referral was made to the counseling center and Dr. Seidel due to ADHD, ADD, and depression. (Tr. 355-356).

In a progress note dated February 4, 2003, Elizabeth's diagnoses were changed to: ADHD, predominately inattentive type, depressive disorder NOS, and disruptive behavior disorder. (Tr. 389). The therapist's notes reflect that a complaint of sexual abuse was filed against Elizabeth's father in April of 2003. (Tr. 523). At the time, Elizabeth was very depressed, not sleeping, and crying a lot. (Tr. 520). Elizabeth reported being punished by her grandmother for having made the sexual abuse complaint against her father. (Tr. 520). Elizabeth was told to change her story and say it was her uncle that sexually abused her. (Tr. 520).

AO72A
(Rev. 8/82)

In a progress note dated May 2, 2003, it is noted that Elizabeth was doing well in school and had received satisfactory grades in conduct and As and Bs in her subjects. (Tr. 385). Burch complained that Elizabeth had been telling tales that were causing "welfare problems" for the family. (Tr. 385). Dr. Seidel advised the grandfather that since Elizabeth was not having behavioral or academic difficulties the resumption of Adderall hardly seemed advisable. (Tr. 385). Because Elizabeth was having difficulties sleeping, she was put on Trazodone. (Tr. 385).

On July 9, 2003, Dr. Whitt wrote that the audiogram showed borderline hearing bilaterally. (Tr. 343). He listed his diagnostic impressions as: borderline hearing; serious otitis under control. (Tr. 343).

In a progress note dated July 28, 2003, Dr. Seidel noted that Elizabeth was sleeping well with the addition of Trazodone at nighttime. (Tr. 376). It was also noted she had gone the summer without the use of any stimulant medication for ADHD. (Tr. 376).

On August 20, 2003, Elizabeth's third grade teacher, Frances Hamburg, completed a school questionnaire. (Tr. 326-329). At the time, she had been Elizabeth's teacher for one school year. (Tr. 327). Hamburg noted Elizabeth had a problem with absenteeism due to head lice and surgery on her ear. (Tr. 327).

In communication, she noted Elizabeth had no significant problems. (Tr. 327). In social functioning she indicated Elizabeth had problems with excessive shyness and problems making or keeping friends and that this noticeably interfered with her academic or social progress. (Tr. 327). Hamburg noted these problems were chronic and ongoing and occurred in most situations. (Tr. 327).

AO72A
(Rev. 8/82)

In concentration, persistence, and pace, Hamburg circled 1 (noticeably interferes with academic or social progress) in the following categories: problem concentrating on classwork; problem working independently or staying on task; and problem completing assignments on time. (Tr. 327). At the time, Elizabeth was not on medication. (Tr. 327). Hamburg stated she believed Elizabeth had too many things going on in her little life until its just hard for her to concentrate on anything. (Tr. 327).

With respect to behavioral function, Hamburg indicated Elizabeth did the following on a daily basis: easily intimidated; problem handling personal needs; problem learning from mistakes; problem with self-confidence; and childish/immature. (Tr. 328). Hamburg noted Elizabeth's behavior in these areas noticeably interfered with her functioning. (Tr. 328). Hamburg indicated there had been a sudden worsening in Elizabeth's behavior when she felt sad over something that happened to her. (Tr. 328).

Hamburg indicated she had to verbally correct Elizabeth daily. (Tr. 328). Elizabeth's response to the verbal correction was rated as fair. (Tr. 328).

In the comment area Hamburg wrote: "I think Elizabeth is a very loving child that does need help, not because she misbehaves in school or does poorly. She needs help because there are things a little girl needs." (Tr. 329).

Elizabeth continued to undergo counseling in 2004. (Tr. 472-506, 561-567). On June 11, 2004, Elizabeth was brought to the clinic for crisis intervention based on reports of increased aggression, violence, destruction of property including violence directed toward animals. (Tr. 483). There was also fire setting behavior and argumentative and explosive mood. (Tr. 483). Elizabeth was seen by Dr. Oladele Adebogun, a psychiatrist. (Tr. 483). Dr. Adebogun prescribed Depakote. (Tr. 483).

On September 20, 2004, Ms. Barnes, Elizabeth's therapist, and Dr. Adebogun, wrote that Elizabeth had been receiving mental health services at the Southwest Arkansas Counseling and Mental Health Center since August 7, 2000. (Tr. 558). It was noted that Elizabeth had a diagnosis of depression and attention deficit disorder (ADD). (Tr. 558). Elizabeth's symptoms were said to been "exacerbated and her prognosis poor due to her not following her prescribed medication regime, parental issues and environmental problems." (Tr. 558).

The letter continued:

> Elizabeth's problems hinder her overall daily functioning to a moderate degree. Her current condition is not completely disabling. Elizabeth is able to make personal choices, knows right from wrong, able to understand simple instructions and be in a normal classroom with few modifications. It has been reported by her grandfather that she has destroyed furniture in the house, being cruel to an animal, and lying a lot. The lying behavior is the only behavior that has been personally observed by our services. She denies participating in the other behaviors yet there is some partial evidence that she may have engaged in these behaviors initiated by an older sister. If Elizabeth is given structure, positive reinforcements for her good behavior and affective discipline she is able to function in the classroom and community settings.
>
> We recommend neuropsychiatry testing to more appropriately assess her individual functioning and to fully determine disability by Social Security standards.

(Tr. 558).

On September 21, 2004, an electroencephalogram (EEG) was performed on Elizabeth. (Tr. 573). Both the awake and drowsy EEG were normal. (Tr. 573).

On September 30, 2004, it was noted that Elizabeth's aggressive behavior was reported to be more intermittent. (Tr. 563). However, there were times she went into staring spells as if she was blacking out and often in the morning woke up in a rage. (Tr. 563). It was further

-13-

reported that Elizabeth was hitting herself during the episodes and at the peak of intense anger. (Tr. 563).

On October 11, 2004, Elizabeth's grandfather reported she was being abusive to her sisters, hitting and kicking them impulsively and without provocation. (Tr. 562). On November 29, 2004, Elizabeth reported problems with insomnia and periodic agitated behavior to Dr. Adebogun. (Tr. 561).

On February 7, 2005, Dr. Adebogun noted that Elizabeth was doing better on a combination of Carbitrol, Abilify, and Imipramine. (Tr. 560). She had not exhibited any self-injurious behavior. (Tr. 560).

On March 17, 2005, Elizabeth underwent a neuropsychological evaluation performed by Dr. Paul L. Deyoub. (Tr. 589-597). At the time, Elizabeth was ten years and eight months old and in the fifth grade. (Tr. 589 & 591). The Weschsler Intelligence Scale for Children–Third Edition (WISC-III) was administered. (Tr. 591-592). Elizabeth obtained a verbal IQ of 84, a performance IQ of 82, and a full scale IQ of 82. (Tr. 592).

The Wide Range Achievement Test–Third Edition (WRAT-3) indicated Elizabeth was reading at the eighth grade level, spelling at the fourth grade level, and her arithmetic was at the fifth grade level. (Tr. 592). It was noted these test scores were well above the IQ of 82. (Tr. 592).

Her scores on the Conners' Continuous Performance Test (CPT) were "markedly atypical scores indicating significant problems with attention and concentration and an Index of 20.74, most likely consistent with her history of ADHD." (Tr. 593). Her score on the

AO72A
(Rev. 8/82)

Developmental Test of visual-Motor Integration (VMI) was 88, which is low average, and consistent with her IQ. (Tr. 593).

Her scaled scores on the Halstead-Reitan Battery Neuropsychological Deficit (NDS) indicated there were problems with Elizabeth's overall neuropsychological functioning. (Tr. 593). It was noted she had problems with motor functions and poor grip strength and poor finger tapping. (Tr. 593). Her sensory examination was essentially normal but Elizabeth's visual/spatial analysis was poor. (Tr. 593). Her attention and concentration were poor. (Tr. 593). Her memory was poor which indicated some difficulty with retaining information. (Tr. 593-594).

Elizabeth had an under-socialized aggressive profile which suggested she had significant emotional problems. (Tr. 595). She also was high for conduct disorder and oppositional defiant disorder. (Tr. 595). Elizabeth reported significant depression on the Children's Depression Inventory (CDI). (Tr. 595).

Dr. Deyoub listed the following Axis I diagnoses for Elizabeth: Attention Deficit Disorder Predominately Inattentive Type; Sexual Abuse of a Child Victim; Depressive Disorder NOS (post-traumatic features); Parent-Child Relational Problems; and Cognitive Disorder. (Tr. 596). Dr. Deyoub noted that Elizabeth had more emotional problems than cognitive problems. (Tr. 596). He stated she had significant problems with attention and concentration but not as much with hyperactivity. (Tr. 597).

Dr. Deyoub noted that her emotional problems affected her adaptive functioning more that her cognitive limitations. (Tr. 597). He noted Elizabeth was also:

> high for poor ego strength and excessive withdrawal and she has features of post-traumatic stress associated with her depression. She indicates she has to

-15-

push herself to do her schoolwork, she has trouble sleeping, she is tired all the time, she does not feel like eating, she feels alone, is not sure anyone loves her, and that her schoolwork is not as good as before. These were all comments she made on the CDI. She indicated nothing is fun at all, she thinks about bad things happening and she even thinks about killing herself, but would not do it. This is why her depression is significant, but she does not have any adaptive behavior deficits associated with mental retardation.

(Tr. 597).

Dr. Deyoub also completed a childhood disability assessment form. (Tr. 601). Dr. Deyoub found no evidence of limitation in the following categories: acquiring and using information, moving about and manipulating objects, caring for yourself, and health and well-being (Tr. 601). He found less than marked limitation in attending and completing tasks. (Tr. 601). He found a marked limitation in interacting and relating with others. (Tr. 601).

## DISCUSSION

This court's review is limited to whether the decision of the Commissioner to deny benefits to Elizabeth is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *See Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). We conclude that the Commissioner's decision is not supported by substantial evidence.

AO72A
(Rev. 8/82)

A three-step analysis applies when determining childhood disability. *Moore ex re. Moore v. Barnhart,* 413 F.3d 718, 719 (8th Cir. 2005). First, the ALJ must determine whether the child has engaged in substantial gainful activity. *See* 20 C.F.R. 416.924(b). Second, the ALJ must determine whether the child has a severe impairment or combination of impairments. *See* 20 C.F.R. 416.924(c)). Third, the ALJ must determine whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment. *See* 20 C.F.R. § 416.924(d). In the present case, the ALJ found that Elizabeth did not have an impairment that met or medically equaled a listed impairment. (Tr. 16).

The ALJ then turned to the question of functional equivalence. In analyzing functional equivalence, we ask whether "what [Elizabeth] cannot do because of [her] impairments . . . is functionally equivalent in severity to any listed impairment that includes disabling functional limitations in its criteria." 20 C.F.R. § 416.926a(a). Functional equivalence may be established by demonstrating marked limitations in two, or extreme limitations in one of the following areas: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. *See* 20 C.F.R. § 416.92a (d). The ALJ found, relying on neuropsychological evaluation performed by Dr. Paul Deyoub, and a letter from Elizabeth's therapist, Janelle Barnes, and psychiatrist, Dr. Ola Adebogun, that Elizabeth had a less than marked limitation in the domain of attending and completing tasks, a marked limitation in the domain of interacting and relating to others, and a less than marked limitation in the domain of health and physical well being. (Tr. 20).

-17-

We conclude the ALJ erred in finding Elizabeth had less than a marked limitation in the domain of attending and completing tasks. Elizabeth's CPT scores revealed "[s]he had markedly atypical scores indicating significant problems with attention and concentration." (Tr. 593). Additionally, Elizabeth's scores on the Halstead-Reitan Battery Neuropsychological Deficit (NDS) indicated her attention, concentration, and memory were poor and that she had some difficulty retaining information. (Tr. 593-594).

According to Dr. Deyoub's report Elizabeth's teacher reported Elizabeth had poor academics and poor attention. (Tr. 595). Elizabeth's third grade teach, Hamburg, indicated Elizabeth's concentration, persistence and pace noticeably interfered with her academic or social progress. (Tr. 327). Elizabeth and her grandfather testified that she has difficulty remembering to do her homework and to return her homework to school. (Tr. 614-515, 628). Her grandfather additionally testified Elizabeth wasn't paying attention in school. (Tr. 628). With respect to Elizabeth's ability to stay on task, her grandfather testified he cannot get Elizabeth to sit down long enough to read and her grandmother has to pick out Elizabeth's clothes but then she can dress and undress herself. (Tr. 631-632).

The court is also troubled by the reasons given by the ALJ for discounting Dr. Ibarra's report dated June 29, 2001. While the ALJ did attempt to issue a subpoena to Dr. Ibarra, it was obvious from both the records of the Southwest Arkansas Counseling and Mental Health Center and the hearing testimony that Elizabeth's case was taken over by first Dr. Seidel and then Dr. Abebogun. The records indicate Elizabeth was last seen by Dr. Ibarra in June of 2002. (Tr. 411). Burch testified at the hearing that Dr. Ibarra was transferred to Dallas. (Tr. 635).

AO72A
(Rev. 8/82)

Obviously, a subpoena directed to a facility at which a doctor had not practiced for three years would elicit no useful information.

The ALJ further remarked that Dr. Ibarra's report appeared to be a recitation of the grandfather's allegations and not an accurate reflection of Elizabeth's true functioning. (Tr. 20). The report in question is not in narrative format. (Tr. 243-249). Instead, the report is on a form entitled "psychiatric documentation form." (Tr. 243-249). Dr. Ibarra merely checked the type of psychiatric disorder he believed was present in Elizabeth and checked the symptoms or manifestations of the disorder Elizabeth exhibited. (Tr. 243-249). Dr. Ibarra then noted the functional limitations Elizabeth had as a result of the disorder. (Tr. 249). Given this, it is not clear what the ALJ meant by his comment regarding the "grandfather's allegations."

Despite the limited utility of Dr. Ibarra's report as perceived by the ALJ, the ALJ made no attempt to obtain further information from Elizabeth's treating psychiatrist at the time, Dr. Abebogun. While Dr. Adebogun may not have been able to explain Dr. Ibarra's reasoning, Dr. Adebogun could certainly have been asked to voice an opinion on how Elizabeth's disorders affected her functioning in the six domains.

Based on the evidence of record and the above discussion, we find substantial evidence does not support the ALJ's determination. On remand, the Commissioner should: obtain Elizabeth's school records and ask her teachers to fill out school questionnaires; have Elizabeth's treating psychiatrist provide information regarding Elizabeth's limitations in the six domains or complete a childhood disability assessment form; and ask Dr. Deyoub to explain the conclusions he has drawn from the tests he administered in terms of the applicable six domains and/or ask for a further explanation of the impact on daily activities that would

AO72A
(Rev. 8/82)

be caused by Elizabeth having "significant problems with attention and concentration." The Commissioner may also want to obtain additional information regarding Elizabeth's hearing. We note that on July 9, 2003, Dr. Whitt noted that the audiogram showed "borderline hearing bilaterally." (Tr. 343). The ALJ should then re-evaluate his determination that Elizabeth has no marked limitation in the following domains: acquiring and using information and attending and completing tasks.

## CONCLUSION

Based on the foregoing, we find the decision of the Commissioner denying benefits to the plaintiff should be reversed and this matter be remanded to the Commissioner for further proceedings consistent with this opinion. A separate judgment in accordance herewith will be concurrently entered.

Dated this 30th day of August 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)